**Francis G. BAUER, Plaintiff,**

v.

**The INTERPUBLIC GROUP OF COMPANIES, INC., et al., Defendants.**

**No. C–02–2406 EDL.**

United States District Court, N.D. California.

March 20, 2003.

James M. Morris, Paul G. Nakaue, Morris & Nakaue, Stockton, CA, for Plaintiff.

Ethan D. Dettmer, Joel S. Sanders, Michael A. Sitzman, Gibson, Dunn & Crutcher LLP, San Francisco, CA, for Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

LAPORTE, United States Magistrate Judge.

In this action for intentional interference with contract and unfair competition, brought by plaintiff Francis G. Bauer ("Bauer") against defendants The Interpublic Group of Companies, Inc. ("IPG"), The Partnership, Octagon Football, and Octagon Marketing and Athlete Representation, Inc. ("Octagon"), defendants have

filed a motion for summary judgment. For the reasons set forth below, defendants' motion is granted.

## I. BACKGROUND

In this action, Bauer alleges that defendants interfered with his contract with National Football League ("NFL") player David Carr ("Carr"). Bauer contends that defendants unlawfully convinced Carr to terminate his contract with Bauer and sign with defendants instead.

Bauer is a contract advisor, commonly referred to as an agent, with the National Football League Players Association. (Bauer Decl. ¶ 2.) He has been an agent for more than 20 years, and provides agency services in the form of contract negotiations, sports career counseling, job placement, and related services to professional football players. (Bauer Decl. ¶ 2.)

For the 2001 college football season, Carr was quarterback for Fresno State University. (Carr Decl. ¶ 1.) During the fall and winter of 2001, he was heavily recruited by a number of sports agents and agencies throughout the country to represent him in the 2002 NFL draft. (Carr Decl. ¶ 2.)

Bauer first met Carr and his father, Rodger Carr, in the summer of 2001. (Bauer Decl. ¶ 3.) During that meeting, Bauer was told that all dealings with sports agents would be through Rodger Carr because of the close relationship between father and son, and to enable Carr to keep his focus on playing football. (Bauer Decl. ¶ 3.) Bauer and Rodger Carr had several conversations that summer. (Bauer Decl. ¶ 4.) In November, Bauer visited Rodger Carr and Carr's mother, Sheryl Carr, in Bakersfield to discuss the NFL, the services Bauer provides, and how contract negotiations are conducted. (Bauer Decl. ¶ 7.) Bauer spoke with Carr weekly by telephone, and attended every home game. (Bauer Decl. ¶ 6, 8.) After the regular season ended, Bauer met with Carr and his wife, Melody Carr, for two-and-a-half hours about the business aspects of representation. (Bauer Decl. ¶ 12.)

On New Year's Eve, Bauer and his wife attended a football game with the Carr family. (Bauer Decl. ¶ 14.) After the game, Sheryl Carr invited them to attend a party. (Bauer Decl. ¶ 15.) During that party, at 12:03 a.m. on New Year's Day, 2002, Carr signed a representation agreement with Bauer. (Bauer Decl. ¶ 17, and Ex. A.) The contract provided that:

> either party may terminate this Agreement effective five (5) days after written notice of termination is given to the other party. Notice shall be effective for purposes of this paragraph if sent by certified mail, postage prepaid, return receipt requested to the appropriate address contained in this agreement.

(Bauer Decl., Ex. A, ¶ 12.)

Carr attests that he signed with Bauer based almost entirely on his parents' recommendation. (Carr Decl. ¶ 3.) Shortly after signing with Bauer, Carr had second thoughts because he was not really involved in the agent selection process. (Carr Decl. ¶ 3.)

Over the next 12 days, Bauer had various business discussions with Carr, introduced him to various NFL players and administrators, and arranged for former Cincinnati Bengals head coach, Bruce Coslet, to come to Fresno to work with Carr. (Bauer Decl. ¶¶ 18–25.) On Friday, January 11, Coslet and Bauer met Carr and two of his friends at the practice field. (Bauer Decl. ¶ 25.) Trent Dilfer ("Dilfer"), quarterback with the Seattle Seahawks and a longtime friend of Carr's, arrived later. (Bauer Decl. ¶ 26; Dilfer Decl. ¶ 2.) Dilfer and Carr had worked out together the previous summer. (Carr Dep. 39:23–24.) Dilfer criticized Coslet's workout.

(Bauer Decl. ¶ 26.) After the workout, Carr hugged Bauer goodbye, and told Bauer that he would see him on Monday for a media training session in Los Angeles. (Bauer Decl. ¶ 26.) Carr and Dilfer remained on the field after Bauer and Coslet left. (Bauer Decl. ¶ 26.)

Up until this point, Bauer had never sensed nor been informed that Carr was unhappy with his decision to enter into a contract with Bauer. (Bauer Decl. ¶ 27.) Bauer constantly reminded Carr that it was a two-way relationship in terms of communication and that he fully expected that Carr would tell him if he had a problem or did not want to do something that Bauer had set up. (Bauer Decl. ¶ 27.) Bauer submits declarations from various people who attest that Carr seemed happy during the period he was signed with Bauer, and did not express any regrets. (See, e.g., Ellard Decl. ¶ 3; Coslet Decl. ¶¶ 4–7; Chandler Decl. ¶¶ 4–5; Ramsdell Decl. ¶¶ 4–5; Armey Decl. ¶¶ 3–4; Martz Decl. ¶¶ 6–7.)

Carr attests that he decided to fire Bauer on January 12. (Carr Decl. ¶ 4.) He left him a message that day. (Carr Decl. ¶ 4.) Later, he sent him a letter, first by regular mail and then by registered mail, to officially terminate the relationship. (Carr Decl. ¶ 4.)

Carr testified at deposition that he fired Bauer because "I didn't feel comfortable that it was my decision, I didn't feel comfortable that I had gone through a process that would give me the right agent for myself and my family." (Carr Dep. 42:7–13.) He also testified that " I didn't feel that I had gone through and done enough research myself or learned enough about the agent process or learned enough about just everything that goes into it." (Carr Dep. 50:13–16.) Carr was also concerned that "I don't know that you have to hit it off with an agent, I don't know that you have to be best friends but we weren't—

and that was something that weighed on me, I guess." (Carr Dep. 50:21–51:1.) Carr had "just a feeling in my stomach, spending time with Frank, having him call all hours of the day. I'm a guy that likes to separate and—you know, family and it kind of seemed like it was all running together and that's what I didn't want." (Carr Dep. 64:14–18.) Carr also testified that:

> I didn't think it was the best fit for me. I think there were other agents out there that could do a lot more, that Frank was in over his head. A lot of the draft boards had me in their top five picks and maybe the first pick, and I know that Frank hadn't had anyone that high before and I didn't think he could deal with it. And just in dealings with Frank during the couple of days I was with him, it didn't seem like he could handle things that were going on.

(Carr Dep. 105:2–11.)

On Sunday, January 13, 2002, at around 10:30 a.m., Bauer received a telephone call from Carr, in which Carr told him that he wasn't going to go to the media training in Los Angeles and that he "had learned things about me that were of public knowledge." (Bauer Decl. ¶ 28.) Carr said he was looking for other representation and would make a decision before January 18 before he left for the Senior Bowl. (Bauer Decl. ¶ 28.) Carr hung up, and Bauer called back. (Bauer Decl. ¶ 28.) Carr told Bauer that his father didn't research enough about Bauer and that Carr was now taking things into his own hands. (Bauer Decl. ¶ 28.) Carr hung up on Bauer again. (Bauer Decl. ¶ 28.)

Bauer called Carr's parents and spoke with Sheryl Carr. (Bauer Decl. ¶ 29.) Bauer attests that Sheryl Carr told him that Carr had received in the mail the previous Friday some newspaper articles about Bauer's ex-partner's indictment for

murder. (Bauer Decl. ¶ 29.) Sheryl Carr attests that when Carr called her to tell her he had terminated Bauer, she formed the impression that Carr had received some specific correspondence concerning Bauer or his past dealings or relationships. (Sheryl Carr Decl. ¶¶ 3–4.) She attests that "I later learned from David that this impression was not correct, and that David had not received any communication, letter or document that mentioned anything about Mr. Bauer or his past dealings or relationships." (Sheryl Carr Decl. ¶ 4.) At deposition, she testified that Carr never told her that he had received anonymous information that was negative about Bauer or that he had received anything in the mail that was negative about Bauer. (Sheryl Carr Dep. 30:23–31:5.) "I just assumed it was anonymous because he wouldn't tell me what it was about." (Sheryl Carr Dep. 30:14–15.)

At deposition, Carr acknowledged telling his mother that he had received some negative things about Bauer in the mail, but testified that, in fact, he had never received anything negative about Bauer. (Carr Dep. 93:1–94:15.) In his declaration, Carr denies telling his mother that he received an anonymous letter about Bauer and his reputation. (Carr Decl. ¶ 5.) At deposition, Carr clarified that:

> I don't know that she asked me if it was an anonymous letter concerning his reputation. I just told her that I received some marketing materials that did not speak highly of Frank and that's pretty much it.

(Carr Dep. 95:1–12.) "I needed some concrete evidence because my mom was so emotionally involved with Frank, I felt I needed some evidence to tell my mom that this is why I did it." (Carr Dep. 89:13–16.)

> Again, Frank and my dad were really attached to each other and I felt like in my own, maybe immature way, that I needed to explain myself somehow using some evidence, I guess. Because just the fact saying that, "Mom, I don't want to have Frank as my agent, you did a bad job as a mother or as a father, would not be right."

(Carr Dep. 91:12–17.) Carr testified at deposition that he had regularly received anonymous mail "that badmouthed agents" and that his mother knew that he had received such mail. (Carr Dep. 89:10–90:22; 94:7–8.) None of those letters contained any negative information about Bauer, however. (Carr Dep. 90:23–24; 94:11–15.) Carr attests in his declaration that he never received any information about Bauer from anyone other than Bauer himself. (Carr Decl. ¶ 5.) He has never received, reviewed or read any documents or letters that attacked Bauer, disparaged his character in any manner or made reference to his prior business associations or dealings. (Carr Decl. ¶ 11.)

Bauer's employee Kenny Chapman attests, however, that he traveled to Carr's home in Fresno on January 29, 2002 to pick up airline tickets for a trip to Los Angeles that Carr and Bauer were to have taken on January 14. (Chapman Decl. ¶ 3.) Chapman told Carr that Bauer wanted Chapman to ask about the "bad articles that portrayed Frank in a bad light." (Chapman Decl. ¶ 4.) Chapman told Carr that "we needed them for next year's recruiting so that we could show the players what was out there since it hurt the business so badly this year." (Chapman Decl. ¶ 4.) Carr went to look for them, and then returned and told Chapman that he could not find them. (Chapman Decl. ¶ 4.) He offered to send them to Chapman, and stated that his business partner had just been there and had taken some things with him and might have them with him. (Chapman Decl. ¶ 4.) When asked about this at deposition, Carr testified:

I don't remember exactly what I said to him. Either Mr. Koal had them or I had thrown them away. (Carr Dep. 98:2–7.)

Sheryl Carr told Bauer that she was upset with Carr's decision and had tried to talk him out of it. (Bauer Decl. ¶ 29.) Bauer later talked with Rodger Carr, who told Bauer that he couldn't help him because Carr was handling the matter. (Bauer Decl. ¶ 29.) Rodger and Sheryl Carr wrote Bauer a letter, dated January 13, in which they expressed gratitude to Bauer and regret that Carr was going to choose another agent. (Bauer Decl. ¶ 29, and Ex. B.) In that letter, they stated:

> We wanted you to know how sorry we are that you may have been hurt, by David choosing to take another path with agencies.... Like we've often told you, David has a mind of his own and on occasion expresses it loudly. It would appear he feels the need to make this decision regarding his future in the NFL on his own.... Even though you may not be David's agent, you are still considered our friend as well as Dave and Melody's.

(*Id.*)

Carr attests that when he called Bauer to terminate their relationship, he had not made any decision concerning who or which agency he would turn to next. (Carr Decl. ¶ 6.) The day after he called Bauer to tell him he was terminating the contract, Carr called Dilfer and asked him how he went about selecting an NFL agent. (Carr Decl. ¶ 6; Carr Dep. 98:12–25.) He asked Dilfer about the process of selecting an agent, but did not ask him what agent or agents to pick. (Carr Dep. 98:12–19.) Dilfer told Carr that he had hired H Koal to help him in the selection process. (Carr Decl. ¶ 6; Carr Dep. 99:5–11.) Carr obtained Koal's number from Dilfer. (Carr Decl. ¶ 6; Carr Dep. 99:5–11.) Koal is an independent business man-

ager for a number of NFL players, but is not a certified NFL contract advisor, and is not affiliated with any certified NFL contract advisors. (Koal Decl. ¶ 1.)

Carr called Koal and, on January 14, asked if he would help in Carr's agent selection process. (Carr Decl. ¶ 7.) Koal recalls the date of this call as January 13. (Koal Decl. ¶ 3.) Carr told Koal that he had terminated his contract with Bauer, but that he didn't know whom he wanted to replace him. (Koal Decl. ¶ 3.) Koal and Carr discussed several agents and agencies, including David Dunn, IMG and Octagon. (Carr Decl. ¶ 7.) After the discussion, at Carr's instruction, Koal arranged initial interviews with Mike Sullivan and David Dunn. (Carr Decl. ¶ 7; Koal Decl. ¶ 4.)

Sullivan was also Dilfer's agent. (Carr Dep. 40:5–11.) Sullivan is director of Octagon Football and has been a certified NFL contract advisor since 1985. (Sullivan Decl. ¶ 1.)

On January 16, Bauer drove to Fresno to meet with David and Melody Carr. (Bauer Decl. ¶ 31.) During the two hour meeting, they discussed the possibility of Carr keeping Bauer as his agent. (Bauer Decl. ¶ 31.) Carr informed Bauer that he had already mailed the letter of termination the previous day, January 15. (Bauer Decl. ¶ 31.) At the end of the meeting, Carr told Bauer he had to make one phone call and asked where he would be later, but he never called Bauer. (Bauer Decl. ¶ 31.) On Friday January 18, Bauer spoke by telephone with Carr, who told him that he hadn't yet made a decision. (Bauer Decl. ¶ 33.)

On January 17, Carr met with Sullivan in Fresno. (Carr Decl. ¶ 8.) Melody Carr and H Koal were also present. (Carr Dep. 25:5–9.) Carr testified at deposition that after they interviewed with Sullivan, they told David Dunn not to come to the inter-

view Koal had arranged. (Carr Dep. 31:23–25.)

On January 22, Carr signed a new Standard Representation Agreement with Octagon. (Carr Decl. ¶ 8; Carr Dep. 22:13–18.) Carr also testified at deposition, however, that he decided to hire Sullivan the day he had the interview, and signed the agreement the next day or the day after. (Carr Dep. 26:15–17.) Melody Carr recalls seeing Carr sign the contract at the Senior Bowl on Tuesday, which was January 22, and was positive that the contract wasn't signed the previous week. (Melody Carr Dep. 39:8–19.) Dunn attests, however, that when Koal called him on January 17, Koal told him that Sullivan had returned to Fresno and that Carr and Sullivan had signed a Player Representation Agreement. (Dunn Decl. ¶ 4.)

On Tuesday, January 22, Bauer ran into Carr, but Carr wouldn't look at him. (Bauer Decl. ¶ 34.) After January 22, Bauer never heard from Carr or his family again. (Bauer Decl. ¶ 34.)

Bauer attests that later that day, Sullivan approached Bauer and told him that he didn't send the articles. (Bauer Decl. ¶ 34.) An article about Carr's alleged receipt of an anonymous letter containing an old news article about Bauer's ex-partner's indictment for murder had appeared in the January 21–27, 2002 issue of SportsBusiness Journal, and was being widely discussed at events leading up to the Senior Bowl on January 21 and 22. (Sullivan Supp. Decl. ¶ 2 and Ex. B.) Sullivan attests that he approached Bauer and told him that he had nothing to do with Bauer being fired. (Sullivan Supp. Decl. ¶ 3.) Bauer asked him about the letter, and Sullivan said he didn't know anything about any letter. (Sullivan Supp. Decl. ¶ 3.) Sullivan attests that the only written material he ever sent or caused to be sent to Carr was a standard company brochure, which he sent to Carr in October 2001 in care of the

Fresno State Athletic Department. (Sullivan Decl. ¶ 3.)

Bauer received a letter of termination from David Carr, which is dated January 16. (Bauer Decl. ¶ 38, and Ex. C) The letter was sent by certified mail, and is postmarked January 17. (Bauer Decl. ¶ 38, and Ex. C.) The letter states:

> This letter is to confirm my previous letter (dated January 14, 2002), in which I indicated to you that I have decided not to use your services in any manner. Therefore you will not serve as my agent. Thank you.

(Bauer Decl., Ex. C.) Bauer's declaration does not state whether or not he also received a separate termination letter dated January 14, but does not deny it.

Carr attests that at no time did Sullivan or anyone at Octagon Marketing and Athlete Representation, Inc., Octagon Football (or its parent companies and affiliates, the Interpublic Group of Companies, Inc. and The Partnership), Dilfer, or Koal ever comment on Bauer, his abilities, his reputation, or his past business dealings or relationships. (Carr Decl. ¶ 9.) At no time did anyone at Octagon, Sullivan, Dilfer, or Koal ever attack or disparage Bauer's character, his abilities, his business, or his agency. (Carr Decl. ¶ 9.)

Carr also attests that from his final bowl game on December 31, 2001, until January 17, 2002, neither Sullivan nor any representative of Octagon contacted Carr or communicated with him in any manner. (Carr Decl. ¶ 10.) Sullivan also attests that neither he nor any other representative of Octagon Football, Octagon Marketing and Athlete Representation, Inc., The Interpublic Group of Companies, Inc. or The Partnership had any contact with Carr between December 31 and January 17 2002. (Sullivan Decl. ¶¶ 2, 4; Sullivan Dep. 92:13–19.) Sheryl Carr attests that she had no contact with Sullivan from the

time she met him at a Fresno State football game in late fall or early winter of 2001 until January 22, 2002. (Sheryl Carr Decl. ¶ 6.) Rodger Carr testified at deposition that he had never spoken with Sullivan about why Carr fired Bauer, or why Carr signed with Sullivan, until the night before his deposition. (Rodger Carr Dep. 41:18–25.)

Dilfer attests that he never recommended to Carr that he fire Bauer and never made any disparaging comments about Bauer, his agency or business associates. (Dilfer Decl. ¶ 5.) Dilfer also attests that he never recommended that Carr hire Sullivan or anyone else at Octagon as his football agent. (Dilfer Decl. ¶ 5.)

Koal attests that until he called Sullivan at Carr's request on January 15, 2002, Koal had never spoken with Sullivan or any other representative of Octagon Football, Octagon Marketing and Athlete Representation or any of their parents or affiliates (including The Interpublic Group of Companies, Inc. or the Partnership) with regard to Carr. Prior to his January 13 phone call with Carr, Koal had never discussed Carr with anyone, except for one phone call to Dilfer when Fresno State was on the cover of Sports Illustrated some months earlier. (Koal Dep. 31:14–17.)

Carr was the one who initiated contact with Octagon through Koal after he terminated his relationship with Bauer and after consulting with Koal. (Carr Decl. ¶ 10.) He attests that his decision to terminate his agreement with Bauer had nothing to do with his subsequent decision to retain Octagon as his agent, and neither Octagon nor its agents played any role in his decision to terminate his relationship with Bauer. (Carr Decl. ¶ 12.)

## II. DISCUSSION

### A. Summary judgment standard

Rule 56(c) of the Federal Rule of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.* The court may not weigh the evidence. *See id.* at 255, 106 S.Ct. 2505. Rather, the nonmoving party's evidence must be believed and "all justifiable inferences must be drawn in [the nonmovant's] favor." *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.1989) (en banc) (citing *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505).

The moving party bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, interrogatory answers, admissions and affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the nonmoving party will bear the burden of proof at trial, the moving party's burden is discharged when it shows the court that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325, 106 S.Ct. 2548.

A party opposing a properly supported motion for summary judgment "may not

rest upon the mere allegations or denials of [that] party's pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505. The opposing party, however, need not produce evidence in a form that would be admissible at trial in order to avoid a summary judgment. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. Nor must the opposing party show that the issue will be resolved conclusively in its favor. *See Liberty Lobby,* 477 U.S. at 248–49, 106 S.Ct. 2505. All that is necessary is sufficient evidence supporting the asserted factual dispute and requiring a jury or judge to resolve the parties' differing versions of the truth at trial. *See id.*

**B. Intentional interference with contract**

■ Bauer's first claim is for intentional interference with contract. "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co., Inc. v. Stewart Title Guaranty Co.,* 19 Cal.4th 26, 55, 77 Cal.Rptr.2d 709, 726, 960 P.2d 513 (1998) (quoting *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1126, 270 Cal.Rptr. 1, 791 P.2d 587 (1990)).

■ Bauer has presented no evidence from which a jury could reasonably conclude that any of the defendants committed acts designed to induce a breach or disruption of his contract with Carr. Although there is conflicting evidence as to whether Carr received an anonymous letter containing negative information about Bauer, there is no evidence that defendants sent the letter. Further, the evidence is undisputed that Carr regularly received anonymous letters containing negative information about other agents before he even signed with Bauer. Thus, even if the Court assumes that Carr did receive such a letter about Bauer, as it must in considering defendants' motion for summary judgment, there is no evidence tying that letter to any of the defendants or their agents. There is no evidence that any of the defendants ever made any disparaging comments about Bauer to Carr. There is no evidence that any of the defendants even spoke to Carr during the time he was under contract to Bauer and before he notified Bauer that he was terminating their contract. It would be mere speculation to conclude that the letter must have been sent by the defendants.

At oral argument, Bauer argued that inferences should be drawn against the defendants because of a large number of telephone calls between Dilfer, Koal, and Sullivan/Octagon beginning on January 8, and several calls between Dilfer and Carr around that time. The existence of calls between Dilfer and Carr, without more, is not suspicious, as it is undisputed that the two men were friends. It is also undisputed that Dilfer, Koal, and Sullivan had a preexisting business relationship that has nothing to do with Carr. Dilfer, Koal and Sullivan all testified at deposition that their increased volume of calls to each other in early January 2002 had nothing to do with Carr, but was related to Dilfer's career. Bauer has presented no evidence to the contrary. Bauer asks the Court nonetheless to infer that Dilfer, at Sullivan's behest, induced Carr to hire Sullivan, even though Sullivan is Dilfer's agent, not the other way around. There is no basis for such speculation.

Bauer also argues that his contract with Carr was not yet terminated when the defendants began negotiating with Carr. Carr's contract with Bauer could be terminated by either party effective five (5) days after written notice of termination is given to the other party by certified mail. (Bauer Decl., Ex. A, ¶ 12.) The evidence is undisputed that Carr orally notified Bauer on January 12 or 13, 2002 that he was terminating the contract, that he mailed a letter to Carr on January 14 confirming the termination, and that a second letter, dated January 16, was mailed by certified mail on January 17. Accordingly to the terms of the contract, then, Bauer's contract with Carr was not terminated until five days after the letter was sent by certified mail on January 17.

The evidence is undisputed, however, that Carr had already decided to terminate the contract by January 13 and notified Bauer of the termination by telephone by that date. There is no evidence that any of the defendants or their agents had any input into that decision, or even spoke with Carr in 2002 before he decided to terminate his contract with Bauer. Although Carr began negotiating with the defendants on January 17, before his contract with Bauer was officially terminated, defendants cannot be said to have induced Carr's termination of that contract, because the evidence is undisputed that he had already made that decision.

■ In a suit for intentional interference with contract, the plaintiff must show that "the act complained of was the proximate cause of the injury." *Augustine v. Trucco,* 124 Cal.App.2d 229, 246, 268 P.2d 780 (1954). Bauer has no evidence that any acts by the defendants caused Carr to terminate his contract with Bauer. Carr was the one who initiated contact with the defendants *after* he decided to terminate his contract with Bauer. The National Football League Players Association Regulations Governing Contract Advisors permits agents to speak with players who are under contract with another agent if the player is the one who initiates the communication. (Sullivan Decl., Ex. A, § 3(B)(20).) The evidence is undisputed that defendants began negotiating with Carr at his request after he had already made his decision to terminate his contract with Bauer. Although there is a dispute of fact as to whether Carr signed a contract with defendants on January 17 or January 22, that dispute is irrelevant because Carr's decision to terminate Bauer occurred before either of those dates.

No reasonable jury could find that defendants induced Carr to terminate his contract with Bauer. Accordingly, summary judgment is granted for defendants on Bauer's claim for intentional interference with contract.

## C. Unfair competition

Bauer also asserts a claim against defendants for unfair competition in violation of section 17200 of the California Business and Professions Code. This claim is based entirely on the same allegations that form the basis of Bauer's claim for intentional interference with contract. As there is no evidence that defendants interfered in any way with Bauer's contract with Carr, Bauer's claim for unfair competition also fails.

## D. Defendants' objections to evidence

Defendants make numerous objections to the evidence submitted by Bauer. Even if all of the evidence to which defendants object is considered, however, Bauer still has not set forth sufficient evidence to survive summary judgment on any of his claims. Accordingly, the Court need not and does not rule on defendants' objections to evidence.

### E. Rule 56(f)

■ Bauer also brings a motion pursuant to Rule 56(f) of the Federal Rules of Civil Procedure to defer ruling on the motion for summary judgment with respect to The Interpublic Group of Companies, Inc. and The Partnership because he wants to take additional discovery to determine whether they are alter egos of Octagon. As Bauer's claim against these defendants is derivative of Octagon's liability, and as the Court has already determined that Octagon is not liable, Bauer has not shown good cause for delaying entry of judgment against The Interpublic Group of Companies, Inc. and The Partnership.

■ Moreover, a party seeking a continuance under Rule 56(f) "must show how additional discovery would preclude summary judgment and why a party cannot immediately provide 'specific facts' demonstrating a genuine issue of material fact." *Mackey v. Pioneer Nat'l Bank*, 867 F.2d 520, 524 (9th Cir.1989). The party seeking a continuance must specifically identify relevant existing information that she needs, and make clear how that information would preclude summary judgment. *Id.; Janas v. McCracken (In re Silicon Graphics, Inc. Sec. Litig.)*, 183 F.3d 970, 989 (9th Cir.1999); *Wellman v. Writers Guild of Am., West, Inc.*, 146 F.3d 666, 674 (9th Cir.1998). Bauer has failed to identify the specific discovery he needs against The Interpublic Group of Companies, Inc. and The Partnership. For this additional reason, his motion for a Rule 56(f) continuance is denied.

### III. CONCLUSION

For the reasons set forth above, and for good cause shown, defendants' motion for summary judgment (docket # 18) is granted. Bauer's motion for a Rule 56(f) continuance (contained in his opposition brief, docket # 29) is denied.

IT IS SO ORDERED.

### JUDGMENT

This action came before the Court for hearing, Magistrate Judge Elizabeth D. Laporte presiding, and the issues have been considered and a decision having been fully rendered.

IT IS ORDERED AND ADJUDGED that in accordance with the Court's order of March 19, 2003, Defendants' Motion for Summary Judgment is GRANTED.